IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CV-732-FL

|  |  |  |
|---|---|---|
| EMMERLI WILCOXSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DIANA PAINTER, individually and in | ) | |
| her official capacity; | ) | |
| PHILIP D. MATTHEWS, individually | ) | |
| and in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motions for summary judgment, made pursuant to Federal Civil Procedure Rule 56, to which plaintiff responded. (DE 85, 87). The issues raised have been briefed fully, and in this posture are ripe for ruling. For the reasons that follow, defendants' motions for summary judgment are granted.

## STATEMENT OF THE CASE

On October 18, 2013, plaintiff commenced this action by filing complaint and amended complaint against defendants City of Raleigh; Raleigh Police Department ("Raleigh P.D."); Harry Dolan, individually and in his official capacity as Raleigh Police Chief ("institutional defendants"); as well as Diana Painter, Philip D. Matthews, and Charles Matthews, II, individually and in their official capacities as police officers ("individual defendants"). (DE 1, 12). Plaintiff asserts claims under 42 U.S.C. § 1983, as well as claims of assault, battery, negligence, and gross negligence under North Carolina law, arising out of an alleged incident of excessive force. Plaintiff seeks

compensatory damages, attorney fees, and costs of this action. All defendants, excluding Raleigh P.D., filed answers to plaintiff's amended complaint. (DE 37, 45, 46, 47, 54). Institutional defendants, and individual defendant C. Matthews, additionally filed motions to dismiss plaintiff's amended complaint. (DE 35, 41, 56).

On July 10, and July 18, 2014, Magistrate Judge Robert B. Jones, Jr., issued memorandum and recommendation ("M&R") (DE 60), and amended M&R (DE 61), recommending the following: motion to dismiss of defendants City of Raleigh and Raleigh P.D. be granted, motion to dismiss of defendant Dolan in his individual capacity be granted, and motion to dismiss of defendant C. Matthews be denied. On August 8, 2014, the court issued order adopting these recommendations as its own. (DE 62).

Following expiration of the deadline to complete mediation and discovery on July 15, 2015, remaining individual defendants C. Matthews, Painter, and P. Matthews each filed motions for summary judgment. (DE 83, 85, 87). Plaintiff stipulated to voluntary dismissal with prejudice of defendant C. Matthews (DE 89),[1] and on September 8, 2015, responded in opposition to the instant motions for summary judgment of defendants Painter and P. Matthews. (DE 90, 92).

In support of her motion for summary judgment, defendant Painter argues: her use of force was objectively reasonable in response to plaintiff's menacing conduct and threatening statements; her objectively reasonable response bars plaintiff's excessive force claim under 42 U.S.C. § 1983, and entitles defendant Painter to qualified immunity; and defendant Painter's objectively reasonable response similarly bars plaintiff's North Carolina tort law claims.

---

[1] The court has amended the caption of this order to reflect dismissal of formerly named defendants City of Raleigh, Raleigh P.D., Dolan, and C. Matthews.

2

Defendant Painter relies upon the following documents generated during the course of this case: excerpts from depositions of plaintiff, defendants P. Matthews, C. Matthews, and herself (DE 85-2, 85-6, 85-7, 85-5); plaintiff's responses to certain defendants' discovery requests (DE 85-8, 85-9); defendant Painter's response to plaintiff's discovery request (DE 85-19); and a declaration by Dave F. Cloutier, an experienced former law enforcement officer and instructor. (DE 85-18). In addition, defendant Painter relies upon documents gathered during the course of an investigation led by Judy Sholar, a Raleigh P.D. officer in charge of investigating the incident on behalf of the Raleigh P.D. Internal Affairs Unit ("I.A.U.").[2] Sholar, in her declaration (DE 85-10), described the investigation's procedure and its collected documents, including: transcripts of recorded statements by defendants Painter, P. Matthews, C. Matthews, and plaintiff (85-11, 85-12, 85-13, 85-14); interviews of plaintiff in the hospital directly after the incident (DE 85-3, 85-4, 85-17); a transcript of a 911 call (DE 85-15); and a report of the scene following the incident, conducted by the Raleigh-Wake City-County Bureau of Identification ("C.C.B.I."). (DE 85-16).

Defendant P. Matthews supports his motion for summary judgment with arguments similar to those of defendant Painter. Defendant P. Matthews argues that he is protected by qualified immunity from plaintiff's § 1983 claim where his response to plaintiff's actions were objectively reasonable in light of the facts and circumstances. With regard to plaintiff's North Carolina tort

---

[2] Sholar describes the role of the I.A.U. as follows:

[C]onducting criminal and administrative investigations arising from alleged wrongdoing by officers and employees of the [Raleigh P.D.]. . . . [T]he IAU also investigates the circumstances surrounding the discharge of firearms by [Raleigh P.D.] personnel even in the absence of any complaint or allegation of wrongdoing or policy violation. . . . [T]he duties of IAU Investigators do not include evaluating the credibility or quality of the gathered evidence[, nor do they] . . . include drawing conclusions from the gathered evidence, or making any determination regarding whether the gathered evidence supports administrative, disciplinary, or criminal action.

(DE 85-10, 1–2).

claims, defendant P. Matthews argues for dismissal on the basis that where a court has found a plaintiff's § 1983 claims to be without merit, and remaining state law claims also are without merit, dismissal is proper in interest of judicial efficiency.

Defendant P. Matthews relies upon the following documents generated during the course of the case: full transcripts of depositions of plaintiff and himself (DE 87-4, 87-3); plaintiff's responses to defendant P. Matthews's discovery request (DE 87-5); as well as the Cloutier declaration and I.A.U. investigation materials previously described. (DE 87-1, -2).

Plaintiff filed responses to the motions to dismiss by defendants Painter and P. Matthews. (DE 90, 92). Plaintiff employs the same arguments in support of both responses.[3] Plaintiff argues defendants Painter and P. Matthews are not entitled to qualified immunity because they employed excessive force against plaintiff, particularly where plaintiff was not committing a crime, not carrying a weapon, and not fleeing arrest. Plaintiff also argues that defendants Painter and P. Matthews failed to warn her of their impending use of deadly force.

In support of these arguments, plaintiff relies upon her own deposition, in addition to the depositions of defendants Painter, C. Matthews, and P. Matthews. (DE 93-2 to -5; 95-2 to -5). Based upon these depositions and her arguments, plaintiff concludes that a viable claim under the Fourth Amendment for use of excessive force exists, thereby preserving her § 1983 claim and North Carolina tort claims, and negating defendants Painter and P. Matthews's argument that failure on § 1983 is fatal to state tort claims.

---

[3] Plaintiff's supporting memoranda differed by only one sentence. (Compare DE 93, 9, with DE 95, 9) (adding to the memorandum opposing defendant P. Matthews's motion for summary judgment that, "Defendant Philip Matthews could have also issued a warning [to plaintiff], but he did not.").

4

## STATEMENT OF FACTS

Except as where otherwise noted below, the undisputed facts are as follows. In October, 2010, plaintiff was traveling from Stone Mountain, Georgia, to Washington, D.C., and while en route stopped at a hotel in Raleigh, North Carolina. (DE 85-17, 4). In the early morning hours of October 21, 2010, plaintiff left her hotel room and walked towards the hotel lobby to purchase food. (Id. at 2). Before plaintiff reached the lobby, two unknown males began to harass her, whereupon she moved to the hotel parking lot. (Id. at 2–3). There, plaintiff began loudly clapping and yelling threats, such as telling the men that they were going to hell. (Id. at 3). Hearing and seeing plaintiff's actions, a hotel employee called a 911 dispatcher to report an emergency and request police. (DE 85-15, 1–2).

At approximately 4:20 A.M., defendants Painter, P. Matthews, and C. Matthews were dispatched to the hotel to address a "nature unknown [911] call," regarding a woman described as screaming and wearing a robe. (Id. at 3; DE 93-3, 21–22). Defendant Painter arrived at the scene first. (Id. at 24). The conditions were dark and foggy, and the two unknown men were not present when she arrived. (DE 87-4, 53, 143). Defendant Painter stopped approximately 30 feet away from plaintiff, exited her marked police car, and stood behind her car's door. (Id. at 26). While doing this, defendant Painter observed plaintiff wearing a long robe and loudly chanting. (Id. at 25). At that point, defendants P. Matthews and C. Matthews arrived on the scene. (DE 87-3, 19; 85-7, 20).

Defendant Painter spoke to plaintiff as defendant Painter moved out from behind her car's door. (DE 93-3, 26, 29). The next events unfolded within a period of 12 seconds. (DE 87-4, 62). Plaintiff was unarmed and still chanting loudly when she began charging towards defendant Painter. (DE 93-3, 33). Sometime during her charge, at least one officer commanded plaintiff to stop. (DE

5

87-4, 53, 62–63; 85-6, 26–27, 29).  When plaintiff did not stop, defendant Painter shot plaintiff multiple times.  (DE 87-4, 53, 62–63; 85-6, 26–28).  Observing this, and seeing plaintiff still moving towards him, defendant P. Matthews shot plaintiff once, at which point plaintiff fell to the ground. (DE 85-6, 25–31; 93-3, 38; 85-7, 34–35; see 87-4, 159).

Defendant C. Matthews then radioed a request for emergency medical services and police backup.  (DE 93-3, 31).  Additional police arrived, and plaintiff was transported to Wake Medical Center.  (DE 85-16, 1–2).  Since the incident, plaintiff suffers from shakes and a limp.  (DE 87-4, 71, 93).  Further discussion of the evidence and the inferences that can be drawn therefrom follow in the court's discussion.

## COURT'S DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id.

6

at 249.  Similarly, "[c]redibility determinations . . . are jury functions, not those of a judge."  Id. at

255.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [non-movant's] favor."  Id.; see United

States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be

drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must

be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability,

. . . and it is the duty of the court to withdraw the case from the jury when the necessary inference

is so tenuous that it rests merely upon speculation and conjecture."  Lovelace v. Sherwin-Williams

Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter of law is

warranted where "a reasonable jury could reach only one conclusion based on the evidence," or

when "the verdict in favor of the non-moving party would necessarily be based on speculation and

conjecture."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  By contrast,

when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is

created," and judgment as a matter of law should be denied.  Id. at 489–90.

B.     Analysis

In support of their motions for summary judgment, defendants Painter and P. Matthews

assert the defense of qualified immunity.  Government officials are entitled to qualified immunity

from civil damages so long as "their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982).  In other words, a government official is entitled to qualified immunity when

the plaintiff has not demonstrated a violation of a constitutional right, or the court concludes that the

7

right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The court first determines whether defendants Painter or P. Matthews violated plaintiff's Fourth Amendment rights by using excessive force against her.

1. Excessive Force Standard

Claims of excessive force during an arrest or investigatory stop are governed by the Fourth Amendment to the United States Constitution and are analyzed under an "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989); Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001). The relevant question is "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). This standard mandates "a careful balancing" of Fourth Amendment rights "against the countervailing governmental interests at stake." Graham, 490 U.S. at 396.

Application of the standard is highly fact dependent; factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest." Id. Courts must consider these and other factors to determine "'whether the totality of the circumstances justifie[s]' the use of deadly force given all the circumstances of the case." Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002) (quoting Tennesse v. Garner, 471 U.S. 1, 8–9 (1985)); see also Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994) (warning that courts must avoid making "[a]rtificial divisions in the sequence of events," and should instead view the evidence "in full context, with an eye toward the proportionality of the force in light of all the circumstances"). For example, in addition to the foregoing, totality of the circumstances includes time of day and physical characteristics of the parties. See McCaskill v.

8

<u>Yankalunas</u>, 245 F. App'x 274, 278 (4th Cir. 2007); <u>Mosby v. Sykes</u>, No. 5:12-CT-3246-FL, 2014 WL 4771665, at *4–5 (E.D.N.C. Sept. 24, 2014).

The reasonableness of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396; <u>Anderson</u>, 247 F.3d at 130 ("To evaluate excessive force, we view the facts from the <u>perspective of the officer</u>.") (emphasis added). In certain circumstances, this requires distinguishing between witnesses' and officers' accounts of an event. <u>Anderson</u>, 247 F.3d at 130 ("In a rapidly evolving scenario . . . a witnesses's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle."). Therefore, "[m]inor discrepancies in testimony do not create a material issue of fact in an excessive force claim . . . [when] the witness views the event from a worse vantage point than that of the officers." <u>Id.</u> (citing <u>Sigman v. Chapel Hill</u>, 161 F.3d 782, 788 (4th Cir. 1998)).

The objective reasonableness standard does not require officers to be absolutely sure of the nature of the threat or the suspect's intent to cause them harm. <u>Elliott</u>, 99 F.3d at 644. Rather, use of deadly force is justified where a reasonable officer would have sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others. <u>Clem</u>, 284 F.3d at 550 (quotations omitted). In this respect, "an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." <u>Anderson</u>, 247 F.3d at 131 (collecting cases from the Fourth Circuit).

Even if a plaintiff is unarmed, she may unwittingly cause an officer to fear immediate and serious physical harm that would justify a reasonable officer's response with deadly force. <u>See id.</u> at 132; <u>see also</u> <u>Reese v. Anderson</u>, 926 F.2d 494, 501 (5th Cir. 1991) ("Also irrelevant is the fact

that [the suspect] was actually unarmed. [Defendant officer] did not and could not have known this. The sad truth is that [the suspect]'s actions alone could cause a reasonable officer to fear imminent and serious physical harm."). For example, in <u>Anderson</u>, the Fourth Circuit Court of Appeals found use of deadly force reasonable where an unarmed man suspected of carrying a gun reached behind his back towards a bulge under his clothing. 247 F.3d at 128. Similarly, in <u>McLenagan v. Karnes</u>, 27 F.3d 1002 (4th Cir. 1994), use of deadly force was found reasonable where officers shot an unarmed victim as he was running towards them after an officer was warned that a suspect was on the loose and armed. <u>Id.</u> at 1007–08.

With regard to the degree of force used, courts are reluctant to second guess officers' responses to immediate threats in exigent circumstances. In <u>Anderson</u>, the court rejected a plaintiff's argument that a material factual dispute existed as to the reasonableness of the defendant officer's conduct where the defendant failed to utilize available cover behind protective pillars rather than firing upon the plaintiff. 247 F3.d at 131 ("[W]e decline to adopt 20/20 hindsight to second guess [the defendant]'s decision to shoot rather than take cover, given that [the defendant] reasonably believed his life to be in imminent danger."). Once an officer has chosen to use a gun, the number of shots fired, without more, is not determinative of whether the force used was reasonable. <u>See</u> <u>Elliott</u>, 99 F.3d at 643 ("The number of shots by itself cannot be determinative as to whether the force used was reasonable."); <u>Wright v. Hales</u>, No. 5:09-CT-3114-FL, 2011 U.S. Dist. LEXIS 139345, at *10 (E.D.N.C. Dec. 5, 2011) (finding 14 or 15 shots to be reasonable use of force where defendant officer "shot until he eliminated the perceived deadly threat").

The objective reasonableness standard requires that courts consider the totality of the circumstances surrounding the use of force. <u>See</u> <u>Graham</u>, 490 U.S. at 397; <u>Rowland</u>, 41 F.3d at 173.

10

Exigency can be an especially important consideration under circumstances where "an officer [is] forced to make a split-second decision as to whether to use deadly force against a suspect who he believes has a firearm." See Waterman v. Batton, 393 F.3d 471, 479 n.9 (4th Cir. 2005); see also McLenagan, 27 F.3d at 1007 (holding use of deadly force justified against a suspect when defendant officer, forced to make a split-second decision, relied on reasonable belief that another officer had seen a gun in suspect's hands even though suspect's hands were handcuffed in front of him and defendant officer never saw a weapon); Slattery v. Rizzo, 939 F.3d 213, 215–17 (4th Cir. 1991) (holding use of deadly force justified when suspect in vehicle repeatedly refused orders to raise his hands and defendant officer perceived he was holding something).

For example, "in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently—and potentially still is—armed, and who is coming towards the officer despite officers' commands to halt," one court "reject[ed] the argument that a factual dispute about whether [the suspect] still had his knife at the moment of shooting is material to the question of whether [the defendant officer] is entitled to . . . qualified immunity." Sigman, 161 F.3d at 788; see also Morales v. Holly, No. 1:09-CV-175, 2012 WL 4511068, at *7 (M.D.N.C. Sept. 28, 2012) (finding plaintiff's attempts to evade arrest exacerbated uncertainty of an already combustible situation, thereby rendering "disputes as to whether Plaintiff was unarmed and/or fully turned toward [defendant officers] [to] not create a genuine issue of material fact").

In sum, defendants Painter and P. Matthews may prevail on a claim of entitlement to qualified immunity if a reasonable officer, given the same totality of circumstances, and possessing the same information, could have had sound reason to believe that plaintiff presented an immediate threat of serious harm at the time each defendant shot plaintiff.

11

2.      Defendant Painter

The court begins its analysis by considering first the severity of the crime at issue.  See Graham, 490 U.S. at 396.  Where a plaintiff neither was suspected of, nor actually committed, a crime, the first factor weighs in her favor.  Bailey v. Kennedy, 349 F.3d 731, 743–44 (4th Cir. 2003).  The parties do not dispute that defendant Painter responded to an emergency call of a "nature unknown."  The emergency dispatcher told her only to expect a "female in front of the [hotel] building screaming, wearing a robe."  (DE 85-15, 3).  Following the incident, plaintiff was not charged with any offense.  Thus, the severity of the crime at issue is nonexistent, and this factor weighs in favor of plaintiff and against defendant Painter.

The court now considers whether plaintiff posed an immediate threat to the safety of the officers and others, and whether plaintiff actively was resisting arrest.  See Graham, 490 U.S. at 396.  Given that no crime was in progress at the time, the parties agree that plaintiff was not actively resisting arrest; therefore, this factor favors plaintiff by default.  However, defendant Painter asserts that plaintiff posed an immediate threat to her safety and that of the other officers, and that her use of force against plaintiff was objectively reasonable given the totality of the circumstances.  Plaintiff contends defendant Painter's use of force was excessive, where it was not the minimum degree of force necessary, and where defendant Painter failed to provide any warning before using deadly force.

With regard to defendant Painter's use of force, the parties dispute whether an objective officer in the same circumstances as defendant Painter reasonably would have believed that plaintiff posed an immediate threat.  Particularly at issue are the location and contents of plaintiff's hands

12

during the incident, and the verbal exchanges between plaintiff and defendant Painter prior to and during defendant Painter's discharge of her weapon.

Although it is unclear whether plaintiff's hands were open or closed, the record shows that at various points during the encounter she was gesticulating, clapping, and reaching out with her hands. (DE 85-3, 21, 30; 87-4, 57–60). Plaintiff testifies that she is unsure whether she was holding two dollars and her hotel card in her hands when the officers arrived, or whether she dropped those items during her encounter with the two unknown men. (DE 85-3, 21–22, 30–31; 87-4, 57–60). Defendant Painter testifies that plaintiff was hitting herself when she arrived, that plaintiff reached her right hand down to her ankle, that plaintiff raised her clenched right hand by her face and outstretched her left arm, and that plaintiff then rushed towards her in that position. (DE 85-11, 5–8; 95-3, 29–34).

The objective reasonableness standard does not require that an officer in defendant Painter's position be absolutely sure of the nature of the threat. See Elliott, 99 F.3d at 644. Although defendant Painter could see plaintiff's hands, she feared that plaintiff had obscured within them a small weapon, such as a knife. (DE 85-11, 18). When plaintiff's charge brought her within arm's length of defendant Painter, she perceived an immediate threat requiring use of force. (Id. at 7, 19). The situation here resembles the one in McLenagan, where the defendant officer used reasonable force in shooting a hand-cuffed plaintiff when he rushed to within ten feet of the defendant, and the defendant was unable to see if the plaintiff had a weapon. 27 F.3d at 1005. Therefore, whether plaintiff's hands were open or closed is not a material fact where it can be inferred that plaintiff's hands were moving rapidly and erratically enough that they could have caused a reasonable officer

to fear immediate harm when plaintiff charged to within ten feet of defendant Painter. Accordingly, this factor weighs in favor of defendant Painter and against plaintiff.

With regard to the totality of circumstances surrounding the incident, both plaintiff and defendant Painter agree that conditions were extremely dark and foggy. In fact, both parties compared it to the scene of a horror movie. (DE 87-4, 52; 85-11, 17). Plaintiff testifies that the conditions caused her to be more stressed and scared (DE 87-4, 53); defendant testifies that she was only barely able to make out plaintiff's shape when she first arrived. (DE 85-11, 28; 95-3, 46).[4]

Plaintiff and defendant Painter agree also that the events unfolded rapidly, within 12 seconds, and over the space of approximately 30 feet. (DE 85-11, 29; DE 87-4, 62, 158). They agree that plaintiff ran towards defendant Painter for approximately five seconds, closing the gap between them from 30 feet to 10 feet, at which point defendant Painter shot plaintiff. (DE 95-3, 35; 87-4, 63). During the next six to seven seconds, defendant Painter fired a series of shots, and although the shots occurred rapidly, she briefly paused between them. (DE 87-4, 63–64; 95-3, 36–37). Defendant Painter describes her shots as "one, two, still coming; three, still coming; four, still coming; five." (DE 95-3, 37).

Defendant Painter was "forced to make split-second judgments in circumstances that [were] tense, uncertain, and rapidly evolving." See Graham, 490 U.S. at 397. The "time of day is an important consideration in the totality of circumstances, as is the surprise element," McCaskill, 245 F. App'x at 278, both of which added to the dangerousness of defendant Painter's situation where plaintiff rushed towards defendant Painter, while yelling and chanting, on a dark and foggy night.

_____

[4] Upon the C.C.B.I. agent's arrival at the scene approximately one and a half hours after the incident, he noted that the weather was overcast and foggy, with police car headlights and street lights providing the only lighting. (DE 85-16, 6–7, 10).

14

(DE 93-3, 33). Inasmuch as physical size of the parties matters, see Mosby, 2014 WL 4771665, at *4, plaintiff acknowledges that she was larger than defendant Painter. (DE 87-4, 62).

Further adding to the exigency of the situation were the verbal exchanges between plaintiff and defendant Painter preceding and during plaintiff's charge. Plaintiff acknowledges that she loudly threatened the two unknown men harassing her in the hotel parking lot, saying things such as they would die in hell. (DE 85-17, 3; 85-3, 27–28; 87-4, 47–48). Where the two men left directly before defendant Painter arrived, plaintiff asserts that she did not direct these threats towards defendant Painter or the other officers. (DE 85-3, 27; 87-4, 48–51). However, defendant Painter testifies that, upon arriving at the scene, plaintiff made eye contact with her and told her she was going to die, even while defendant Painter asked plaintiff if she could help her, and told plaintiff to be calm. (DE 85-11, 5, 14–15; 95-3, 26, 28).

In any event, plaintiff grew even more excited by the officers' arrival, and she continued chanting loudly or yelling. (DE 87-4, 48; 85-3, 21). Shortly thereafter, she charged towards defendant Painter. (DE 85-3, 27–28; 87-4, 49). Defendant Painter testifies that she commanded plaintiff to stop multiple times during her advance, (DE 85-11, 7, 15–16; 95-3, 32), and although plaintiff testifies that she did not hear defendant Painter, she admits to hearing a male voice command her to stop. (DE 85-3, 29). From plaintiff's testimony it is unclear whether plaintiff heard that command as she was being shot (DE 85-3, 22; 87-4, 142–43), or prior to being shot. (DE 85-3, 29–30; 87-4, 53, 55, 77). Before shooting, and after commanding plaintiff to stop, defendant Painter testifies that she drew her weapon and pointed it towards plaintiff at chest level. (DE 85-11, 7, 15–16; 95-3, 32).

15

Plaintiff's refusal to stop her charge towards defendant Painter, despite a command to halt and a drawn police weapon, exacerbated the uncertainty of an already combustible situation. See Morales, 2012 WL 4511068, at *7. In Sigman, the suspect's disregard of officers' commands to stop led the court to reject a factual dispute about whether the suspect still carried a knife. 161 F.3d at 788. Here, both defendants Painter and P. Matthews testify that they commanded plaintiff to stop, and plaintiff acknowledges that during her charge she heard at least one male voice tell her to halt. Although defendant did not warn plaintiff she was preparing to shoot, she drew her gun and pointed it in plaintiff's direction. That plaintiff asserts she was unable to see the weapon is not material where the incident must be evaluated from the perspective of a reasonable officer occupying defendant Painter's position. See Elliot, 99 F.3d at 642.

Defendant Painter had further cause to fear immediate harm when plaintiff failed to stop charging towards her despite multiple gunshots to her torso. See Wright, 2011 U.S. Dist. LEXIS 139345, at *10. Taken together, the totality of the circumstances created an exigent situation that could have caused a reasonable officer to make a split-second decision to use his or her weapon in response to threat of immediate harm. Accordingly, this factor weighs in favor of defendant Painter and against plaintiff.

In light of the pertinent factors and the totality of the circumstances, plaintiff has not demonstrated a violation of a constitutional right under the Fourth Amendment based upon defendant Painter's use of force, particularly given her objectively reasonable perception of immediate harm to herself and other officers in the course of a rapidly unfolding exigent situation. Because plaintiff fails to establish a constitutional violation, defendant Painter is entitled to qualified immunity.

16

Plaintiff nonetheless argues that only the minimum necessary degree of force is permitted, and that defendant Painter could have used less force by employing a Taser. Plaintiff asserts that, after being shot, she heard a male officer ask defendant Painter why she did not use a Taser. (DE 85-3, 33–34; DE 87-4, 163). Defendant Painter testifies that, after plaintiff was shot and while plaintiff was trying to stand, either defendant P. Matthews or C. Matthews asked defendant Painter to take out her Taser and keep it ready, which she did. (DE 85-11, 9).

However, the parties' dispute on this issue does not pertain to a material fact where plaintiff incorrectly describes the standard for use of excessive force under the Fourth Amendment. Plaintiff's supporting case, Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997), does not contain the standard ascribed to it by plaintiff, and actually it applies the same standard the court applies here. See id. at 1104 ("[T]he officer must employ a reasonable amount of force when effecting the seizure.") (citing Graham, 490 U.S. at 395). Under the correct standard, defendant Painter's decision to use her gun instead of her Taser was well within the realm of an objectively reasonable response to a perceived threat of immediate harm. See Anderson, 247 F.3d at 131 ("[W]e decline to adopt 20/20 hindsight to second guess [the defendant]'s decision to shoot rather than take cover, given that [the defendant] reasonably believed his life to be in imminent danger.").

Plaintiff also argues that defendant Painter is not entitled to qualified immunity where she failed to warn plaintiff of the potential use of deadly force. Defendant Painter acknowledges that she did not provide a specific verbal warning, but no such warning was feasible in the exigent circumstances plaintiff created in her charge towards defendant Painter. Instead, the incident here contained the exceptional circumstances that plaintiff's supporting cases show would make a prior warning impracticable. Plaintiff cites Floyd v. Detroit, 518 F.3d 398 (6th Cir. 2008), but that case

17

is distinguishable where those officers shot the defendant while taking him by surprise and without communicating to him or considering whether he was armed; whereas here, plaintiff knew defendant Painter was a police officer, plaintiff rushed towards defendant Painter's drawn weapon, and plaintiff acknowledges that she heard an officer command her to stop. Therefore, plaintiff's arguments, that a lesser degree of force was required, and that defendant Painter failed to warn about use of deadly force, are misplaced, and a balance of the relevant factors, including totality of the circumstances, show that defendant Painter is entitled to qualified immunity.

### 3. Defendant P. Matthews

As with defendant Painter, the factors severity of crime and active resistance of arrest favor plaintiff by default, where plaintiff was charged with no crime, and consequently resisted no arrest. However, defendant P. Matthews argues that his use of force against plaintiff was objectively reasonable given the totality of the circumstances and his observation of defendant Painter's unsuccessful attempts to subdue plaintiff before she reached defendant P. Matthews. Plaintiff levies against defendant P. Matthews arguments similar to those applied to defendant Painter, namely, that defendant P. Matthews used excessive force, and that he failed to warn plaintiff before doing so.

Defendant P. Matthews was the last of three officers arriving on the scene, pulling up as defendant Painter was exiting her vehicle and addressing plaintiff. (DE 85-12, 5–6). As defendant P. Matthews walked towards defendant Painter's car, he observed the following: plaintiff was yelling, and then she began charging towards defendant Painter; defendant Painter commanded plaintiff to stop; when plaintiff did not stop, defendant Painter repeated the command before shooting plaintiff; after receiving a number of shots, plaintiff redirected her charge towards defendant P. Matthews from a distance of approximately 10 to 15 feet. (DE 85-12, 5, 7–8).

18

Defendant P. Matthews testifies that conditions were extremely dark and foggy, and that he was unable to understand plaintiff's yelling or see her hands. (DE 85-12, 7–8). He testifies that plaintiff continued charging towards him after defendant Painter shot her. (DE 85-12, 8–9, 24, 37). From his perspective, he observed plaintiff's eyes appeared enlarged, and when he considered this in conjunction with plaintiff's incoherent speech and her ability to withstand defendant Painter's multiple shots, he reasoned that plaintiff was impaired by a narcotic. (DE 85-12, 9–10, 35). Still unable to see plaintiff's hands, defendant P. Matthews commanded plaintiff to stop, and when she continued closing on him to within approximately eight feet, he shot her once, at which point she fell. (DE 85-12, 8–10, 22–23, 35, 37).

In contrast, plaintiff's testimony is unclear with regard to defendant P. Matthews's single shot, although she recalls being shot approximately seven times.[5] (DE 87-4, 63). In her deposition, she testifies to falling down immediately after being shot by defendant Painter, but then asserts she still was standing during subsequent shots—ostensibly including the one shot by defendant P. Matthews. (DE 87-4, 160). Defendants Painter and C. Matthews both testified to defendant P. Matthews firing a single shot at plaintiff. (DE 95-3, 38; 95-4, 35–39).

Defendant P. Matthews's use of force was based upon his observation of defendant Painter's use of force and his own observations of plaintiff. Although his line of sight was partly obstructed when he arrived, defendant P. Matthews testified to seeing plaintiff bend at the waist before bringing her hands up, with her right fist closed, and rushing towards defendant Painter. (DE 87-3, 25–27). Upon seeing defendant Painter fire her gun at plaintiff, defendant P. Matthews reasonably believed that defendant Painter was reacting to an immediate, serious threat based on her interaction with,

---

[5] The C.C.B.I. agent retrieved five shell casings from one gun, and one shell casing from another.

and observation of, plaintiff.  See McLenagan, 27 F.3d at 1007.  Defendant P. Matthews also shared

defendant Painter's same fear of immediate harm when he observed plaintiff fail to stop after

receiving five shots, and when plaintiff continued towards him at full speed.  (DE 87-3, 29–32).  See

Wright, 2011 U.S. Dist. LEXIS 139345, at *10.  Therefore, an objectively reasonable officer in

defendant P. Matthews's position, seeing defendant Painter use her gun against plaintiff to no effect,

and seeing plaintiff approach within ten feet of him, would have been justified in responding to

plaintiff's charge with deadly force.  See McLenagan, 27 F.3d at 1007.  Accordingly, this factor

weighs in favor of defendant P. Matthews and against plaintiff.

The same exigent circumstances that affected defendant Painter also informed defendant

P. Matthews's use of force.  He observed  that conditions were dark and foggy (DE 87-3, 24–26,

33); that plaintiff failed to respond to defendant Painter's and his commands to halt (DE 87-3, 24,

28–30); that plaintiff's charge towards defendant Painter and him occurred over the course of

approximately 15 seconds (DE 85-12, 16–17, 21); and that plaintiff approached to within ten feet

of him before he shot her.  (DE 85-12, 22–23).  Considered together, the totality of the

circumstances created an exigent situation that could have caused a reasonable officer to make a

split-second decision to use his weapon in response to threat of immediate harm, and defendant P.

Matthews's use of force was reasonable where he ceased firing as soon as plaintiff collapsed and

no longer posed a threat to him or the other officers.  See Wright, 2011 U.S. Dist. LEXIS 139345,

at *10.  Accordingly, this factor weighs in favor of defendant P. Matthews and against plaintiff.

 In light of the pertinent factors and the totality of the circumstances, plaintiff has not

demonstrated a violation of a constitutional right under the Fourth Amendment based upon

defendant P. Matthews's use of force, particularly given his objectively reasonable perception of

immediate harm to himself and other officers in the course of a rapidly unfolding exigent situation. Because plaintiff fails to establish a constitutional violation, defendant P. Matthews is entitled to qualified immunity.

Plaintiff argues that defendant P. Matthews used more than the minimum necessary degree of force, and that he failed to warn plaintiff that he intended to employ deadly force. For the reasons stated previously, plaintiff misstates the standard for use of excessive force under the Fourth Amendment. Under the correct standard, defendant P. Matthews's single shot was well within the realm of an objectively reasonable response to a perceived threat of immediate harm, where he had observed defendant Painter using the same degree of force, and where he ceased firing as soon as plaintiff no longer posed a threat to him or other officers. See Anderson, 247 F.3d at 131.

With regard to failure to warn, plaintiff acknowledges hearing, and defendant P. Matthews testifies to, commanding plaintiff multiple times to stop running towards the officers. Therefore, plaintiff's arguments, that a lesser degree of force was required, and that defendant P. Matthews failed to warn about use of deadly force, are misplaced, where a balance of the relevant factors, including totality of the circumstances, show that defendant P. Matthews is entitled to qualified immunity.[6]

4.    Tort Claims

Where "a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim[, it is] fatal to the Plaintiff's state law tort claims." Moore v. Cease, No. 703-CV-144-FL-1, 2005 WL 5322794, at *14 (E.D.N.C.

---

[6] The court does not address whether "the right at issue was [ ] clearly established at the time of the official's alleged misconduct," because the court has determined that "plaintiff has not demonstrated a violation of a constitutional right" under the Fourth Amendment. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

July 5, 2005); see Glenn-Robinson v. Acker, 140 N.C. App. 606, 625 (2000) ("Pursuant to the common law of North Carolina, an assault and battery by a law enforcement officer upon a citizen can provide the basis for a civil action for damages against the officer only if a plaintiff can show that the officer used force against plaintiff which was excessive under the given circumstances.") (quotations omitted). Therefore, where defendants Painter and P. Matthews's objectively reasonable use of force defeats plaintiff's § 1983 claim, plaintiff's state law tort claims for assault, battery, negligence, and gross negligence, also must fail. See Moore, 2005 WL 5322794, at *14.

## CONCLUSION

Based on the foregoing discussion, defendants Painter and P. Matthews's motions for summary judgment, (DE 85, 87), made pursuant to Federal Rule of Civil Procedure 56, are GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 3rd day of March, 2016.

_____
LOUISE W. FLANAGAN
United States District Judge